Frank J. TEDESCO, Plaintiff-Appellee,

v.

The CINCINNATI GAS & ELECTRIC COMPANY, Defendant-Appellant.

No. 71–1090.

United States Court of Appeals,
Sixth Circuit.

Sept. 29, 1971.

Edwin J. Dreibelbis, Cincinnati, Ohio, for defendant-appellant; Richard H. Pennington, Brumleve, DeCamp & Wood, Cincinnati, Ohio, on brief.

Leo J. Breslin, Cincinnati, Ohio, for plaintiff-appellee; Lindhorst & Dreidame, Cincinnati, Ohio, on brief.

Before PHILLIPS, Chief Judge, and WEICK and McCREE, Circuit Judges.

WEICK, Circuit Judge.

Plaintiff Tedesco was a' journeyman lineman with more than twenty years' experience. He had handled work involving everything from 110 to 138,000 volts. At the time of his injury he was employed by Hoosier Engineering Company, an independent contractor, which company had a contract with defendant, Cincinnati Gas & Electric Company (CG&E), to replace certain electric light poles and wires in the area of Mainsville, Ohio. Hoosier had considerable experience in this type of work. It agreed to furnish all labor for the performance of the contract. CG&E prepared the specifications and agreed to and did furnish the poles, wires, racks, fuses, cut-outs and transformers. Hoosier also agreed to carry Workmen's Compensation, Employer's and Public Liability Insurance, and further agreed to—

" * * * indemnify and save harmless the purchaser [CG&E] from and against all claims for personal injury and property damage arising out of any operation or work performed under this agreement."

The contract required Hoosier to install the new poles, lines and equipment beside the old poles so that when the work was completed the electric current could be readily transferred from the old to the new lines. The lines on the poles were primary and secondary; the

primary lines carried 2400 volts. There was a transformer through which the current passed from the primary to the secondary lines to reduce the voltage in the secondary lines to 110 and 220 volts for home use.

CG&E reserved the right to inspect the work as it was being performed, and one of its inspectors did make frequent inspections during progress of the work.

Tedesco was one of a crew of four Hoosier employees who were performing this work. He climbed up one of the new poles which had been installed by the crew, to perform certain work. At that time the secondary lines had been strung but had been laid on top of the rack. They were required to be tied to ceramic insulated spools before the current was turned on for public use.

When Tedesco finished his work he started to climb down the pole and a short circuit or arc suddenly developed in the secondary wires. He testified that the new wires were not supposed to be energized. The arc temporarily blinded him; he grabbed one of the wires for support, which then separated, and he fell to the ground. He was not wearing his safety belt at the time. He testified that he did not know that the lines had been energized, but that one of his fellow-employees had turned on the electricity. If the secondary lines had been attached to the insulator spools no short circuit would have developed.

Tedesco sued CG&E in the District Court to recover damages for serious personal injuries which he sustained as the result of his fall from the pole. Jurisdiction was founded on diversity of citizenship. Tedesco had moved to Florida, and CG&E was a corporation authorized to do business in Ohio. The District Court submitted the case to a jury, which returned a verdict against CG&E in the amount of $81,000, upon which judgment was entered. CG&E appealed, asserting that the Court erred in denying its motions for a directed verdict, made at the close of plaintiff's evidence and at the close of all the evidence, and that the Court erred in denying its

motion for judgment notwithstanding the verdict. The case is governed by Ohio law.

The complaint alleged that CG&E was negligent in the following respects:

1. In supplying a defective rack that had a burr on its surface which cut the insulation on the secondary wires;

2. In installing or causing to have installed in the transformer a fuse of amperage higher than was required, necessary or safe;

3. In failing to warn plaintiff of said defects;

4. In failing to exercise the care required in the handling and distributing of electric current.

■■ In considering the charges of negligence, there can be no question that in the installation of the new poles, wires and equipment, Hoosier was engaged in work inherently dangerous, for high tension lines carrying 2400 volts are dangerous. Hoosier and its employee Tedesco had just as much knowledge of that danger as did CG&E. Because of the dangerous character of the work, CG&E could not delegate the performance thereof to an independent contractor and thereby relieve itself of liability for injury to the public due to the negligence of the independent contractor. Richman Bros. Co. v. Miller, 131 Ohio St. 424, 3 N.E.2d 360 (1936); 28 Ohio Jur.2d 366, § 23. But this rule does not apply to liability of the owner to the independent contractor or his servants. CG&E cannot be held liable for injuries proximately caused to Tedesco by either the negligence of his fellow workers or his own contributory negligence. Ford Motor Co. v. Tomlinson, 229 F.2d 873 (6th Cir. 1956); Schwarz v. General Elec. Realty Corp., 163 Ohio St. 354, 126 N.E.2d 906 (1955).

The rack which Tedesco claims was defective was not being put to its intended use by the Hoosier crew. That use was such that the secondary wires should have been tied to the insulator spools before the current was turned on. CG&E inspector Vest so testified.

Under Ohio law—

"The duty of the owner or proprietor of a business to furnish appliances free from defects for the safety of invitees is limited to the defects from the intended use of those appliances." (Syl.) Hooker v. Kroger Co., 12 Ohio App.2d 105, 231 N.E.2d 344 (1967); 39 Ohio Jur.2d 586, § 64.

The next ground of negligence alleged was that CG&E had installed or caused to be installed in the transformer a fuse of amperage higher than was necessary or safe. The specifications called for a 25-amp. fuse. It was one of Hoosier's crew of four who inserted a 100-amp. fuse, which was the wrong fuse. Jackson, a crew member, who examined the fuse after the accident, testified that the amperage appeared on the top of the fuse.

Counsel for plaintiff made the following argument to the District Court on the subject of the fuse:

"It could very well be that some one on Hoosier overfused this particular transformer but I think we are entitled to the presumption that no one else was negligent, and there has been no showing here, really, that this transformer wasn't properly fused."

The undisputed testimony from Hoosier crew members was that they installed the 100-amp. fuse in the cut-off for the transformer. In so doing, they disregarded the written specifications. In view of the positive testimony of plaintiff's own witnesses, there was clear proof that Hoosier crew members were negligent in installing a fuse of the wrong amperage. There was no evidence of any defect in the transformer. In the absence of proof we may not infer that there was a defect.

It was also contended by plaintiff that the secondary wires were coated with neoprene as an insulating material, and that this was defective. There was no evidence that the neoprene coating was defective. The proof was to the effect that the neoprene was used merely as a weatherproof coating for the wires.

There was no evidence that it was practical or customary in the industry to insulate these wires. In any event, if, as plaintiff contends, there was a sharp burr on the rack, it could cut into the neoprene coating when the wires were pulled over it.

There was no evidence that CG&E had knowledge of the existence of any burr on the rack. None of the Hoosier crew members who installed the rack noticed the burr. Crewman Jackson, plaintiff's fellow employee, testified, "You would never notice it." Hoosier's Division Manager Cottrell inspected the rack after the accident and found nothing wrong with it other than the burn caused by the sparking of the wire.

Plaintiff's case then boils down to the undisputed facts that it was a Hoosier crew member who turned on the current, energizing the lines, before the wires were attached to the insulators. It was a Hoosier crew member who installed the wrong fuse in the cut-off box. Had the wires been properly attached to the insulators plaintiff would not have been injured.

However, there is more. Hoosier had provided safety measures for its employees, which measures would have prevented the accident had they been used. Hoosier's Division Manager Cottrell testified:

"Q All right. Now, with reference to the secondary lines that we have talked about, what were they required to do?

A They are required, the journeyman layman, when they are working in a primary area, to cover all conductors that they might come in contact with, all paths to ground which could include your secondary and your primary. If you are working in this area and your feet or your legs are exposed to conductors, they are to be covered.

Q And specifically what are they to be covered with?

A They are to be covered with rubber protective equipment, which is, we

term it, as a lineman hose. It's a rubber insulating hose. Well, they come in various lengths and they are open, slit, and they can open it and slide them on the conductor.

Q Now, sir, is this protective equipment to be used whether the line is hot or not?

A That is correct. Any ground that they might come in contact with they are to cover. That's basic, not only in our rules, but all rules; in the union's rules, the power company rules, and it's a basic knowledge of a lineman.

MR. DREIBELBIS: No further questions, your Honor."

Paul Riemar, Superintendent of Safety and Training of CG&E, testified that these same safety procedures were standard and were used by CG&E.

The District Court did not submit to the jury any of the specifications of negligence charged in the complaint. Instead, in a colloquy with counsel he stated:

"The Court: Now, insofar as what we are going to send to this jury, we are going to send it to them solely on the frequenter, safe place to work, control. So that the issues for the jury will be the control over either the plaintiff or the location, that being one issue; the safety of the place being another issue of fact; and then, of course, causal relationship, and another question will be the contributory negligence question."

With respect to the intended use of the rack, the Court stated:

"The Court: Well, the problem is easier to see with a ladder if a fellow is walking up a ladder while he is in its intended purpose, but we think they have to do two guesses on that. One was the intended purpose of this just as it was there, to hold a wire insulator. That's not intended to be used without the insulation."

The Court further said:

"THE COURT: If you took an automobile out and drove it across the lake you wouldn't have any product liability case because it went under, surely. Don't you go back to what was the intended use, if it failed while being used as intended by the manufacturer or by the provider?

"It's true we have testimony here that there are times when it's separated, but it's linked right up with it. There is no testimony here that anybody ever as a matter of course or any other way put a hot wire through there without using either an insulator or a cover. Every time you use the insulator you have got testimony of a cover, don't you?

"MR. BRESLIN: Not from Mr. Tedesco. He said he did it before. I mean you can't presume that he was negligent—

"THE COURT: I just think that's too late to take Mr. Tedesco's testimony and let a jury refer to that because somebody does something, some one person, that the provider intended that he do it that way. Now you have got your record on it, but we are only going to send the safe place to work."

In his instructions to the jury the District Judge submitted to the jury the issue only whether CG&E had violated the Ohio "Safe Place to Work Act." Ohio Rev.Code 4101.11, et seq. After reading the statutes, including the definitions of employer, employee and frequenter, he instructed the jury as a matter of law that Tedesco was a frequenter, and that he was a CG&E employee, for the purposes of the Act. He instructed the jury that the burden was on plaintiff to establish that CG&E had custody and control of the premises; that CG&E had an obligation to make the place as free from danger as the nature of the employment would reasonably permit; and that a violation of that duty was the proximate cause of plaintiff's injury. He further instructed the jury on contributory negligence and damages.

■ It seems to us that since plaintiff did not prove any of the specifica-

tions of negligence charged against CG&E, there was nothing to submit to the jury.

■ With respect to control, the only evidence offered by plaintiff was the contract and the fact that CG&E supplied specifications, materials and equipment and regularly inspected the work. This in our judgment was insufficient to establish control. Sullivan v. General Elec. Co., 226 F.2d 290 (6th Cir. 1955); Kelly v. Ford Motor Co., 104 Ohio App. 185, 139 N.E.2d 99 (1957). There was no evidence that CG&E interfered with Hoosier's employees in the manner and means in which they performed their work.

In resisting CG&E's motion for a directed verdict, plaintiff's counsel argued:

"Mr. Breslin: Primarily, sir, although I mean in conjunction with any negligence—I may get to this, any negligence by a coemployee may be the negligence of—I am saying that maybe there is a situation in here where any negligence by a fellow employee may be the negligence of the Gas and Electric Company because they maintained such control over those crews. In other words, they are not immunized because of the Workmen's Compensation Statute, as is Hoosier but, nevertheless, these men could conceivably have been agents of the Cincinnati Gas and Electric Company."

The Court pointed out to counsel that if Hoosier's employees were in reality employees of CG&E, plaintiff's action would be barred by the Workmen's Compensation statutes of Ohio, the remedies under which are exclusive.

The Supreme Court of Ohio has considered the question of liability of an owner to an independent contractor's employees where real or potential danger is involved in the performance of the work. In Wellman v. East Ohio Gas Co., 160 Ohio St. 103, 108, 113 N.E.2d 629, 632 (1953), the Court held:

"The rule of general acceptance is that where an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor."

This case amplifies the above statement though, in terms of the employee's knowledge:

"Or, stating the matter a little differently, one who engages an independent contractor to do work for him ordinarily owes no duty of protection to the employees of such contractor, in connection with the execution of the work, who proceeds therewith knowing and appreciating that there is a condition of danger surrounding its performance." (160 Ohio St. at 108, 113 N.E.2d at 632)

This rule was reiterated in Schwarz v. General Elec. Realty Corp., 163 Ohio St. 354, 126 N.E.2d 906 (1955) (Syl. 1):

"Where an owner of premises engages an independent contractor to do work thereon, an employee of the contractor while performing the work is on the premises impliedly as an invitee of the owner, and the owner owes the employee the duty of exercising ordinary care to maintain the premises in a reasonably safe condition for use, this duty not extending, however, to any inherent hazards necessarily present because of the character of work to be done."

Again *Schwarz* discusses the concept of inherent hazard in terms of obvious danger to the contractor's employees:

"It is apparent that this court in the *Wellman case* limited the rule,

earlier announced in the *Bosjnak case,* [Bosjnak v. Superior Sheet Steel Co., 145 Ohio St. 538, 62 N.E.2d 305] to cases where the independent contractor and his employees enter upon the premises of the contractor's employer as his invitees, unaware and uninformed of hidden dangers on the premises which had been created by the employer or of which he had full knowledge. Here Duffy and its employees had consented to work in an obviously dangerous environment, and in so doing it was Duffy's lack of care, under the circumstances, which proximately caused plaintiff's injury." (163 Ohio St. at 360, 126 N.E.2d at 910)

In Ford Motor Co. v. Tomlinson, 229 F.2d 873 (6th Cir. 1956), Circuit Judge, now Associate Justice, Stewart pointed out that the Ohio Safe Place to Work statutes "were obviously enacted primarily for the benefit of employees. * * * They were rendered largely obsolete by the passage of the Ohio Workmen's Compensation Law." In reversing the judgment for the plaintiff and dismissing the complaint, Judge Stewart stated on page 880:

" 'Where the premises upon which construction work is to be performed by a contractor remains under the control of the principal employer while work is in the course of performance, a servant of the contractor is an "invitee" and as such entitled to recover from the principal employer for any injury which he may sustain by reason of the abnormally dangerous condition of the premises, only if the principal employer has and the servant has not actual or constructive notice of the existence of such condition.' Davis v. Charles Shutrump & Sons Co., 1942 140 Ohio St. 89, Syl. 1, 42 N.E.2d 663. There was no hidden defect or danger

here. That the work of laying the flooring was proceeding simultaneously with the overhead painting was a fact as obvious to the plaintiff as to Ford."

Tomlinson was approved by the Ohio Supreme Court in Moore v. Denune & Pipic, Inc., 26 Ohio St.2d 125, 269 N.E. 2d 599 (1971), and in Debie v. Cochran Pharmacy-Berwick, Inc., 11 Ohio St.2d 38, 227 N.E.2d 603 (1967). The Court in *Denune* held that the rule of res ipsa loquitur was inapplicable and that the record is void of any proof of negligence, and further that the trier of the facts was not permitted to infer that the defendant knew or should have known of the particular hazard which existed in that case.

See also Popowich v. American Steel & Wire Co., 13 F.2d 381 (6th Cir 1926); Davis v. Charles Shutrump & Sons Co., 140 Ohio St. 89, 42 N.E.2d 663 (1942).

*Denune,* in its holding that res ipsa loquitur is inapplicable, is of particular importance here because the District Court did not submit to the jury any of the specifications of negligence, and charged the jury only on the safe place to work law. No one knows in what respect the jury found that the place to work was not reasonably safe considering all of the hazards. In the absence of proof as to negligence or as to any particular in which the defendant violated the Ohio Safe Place to Work statutes, the jury should not be permitted to guess or speculate.

■ We conclude that there is no liability on the part of CG&E and that the District Court erred in denying its motions for a directed verdict.

The judgment of the District Court is reversed and the case is remanded with instructions to dismiss the complaint.